UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| GEORGIA (JO) A. BALDAUF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:04-cv-1571-JDT-TAB |
| | ) | |
| CLIFTON DAVIDSON, individually; | ) | |
| JESSE MARLOW, individually and in his | ) | |
| official capacity as Chief of Police; | ) | |
| and the TOWN OF PITTSBORO, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (Doc. Nos. 63, 64, 65) AND MOTION TO STRIKE REPORT OF EXPERT WITNESS (Doc. No. 102)[1]**

This case has its origins in the sort of uncivil discourse and minor bumping that is altogether too common and too frequently rises to the attention of a federal court.  Here, two defendants are police officers, to whom our society accords special duties and protections.  The squabble also led to an arrest, never a light matter.  The intersection of these rights and responsibilities is not novel, and the law regarding such cases governs the court's disposition of the Defendants' motions for summary judgment.

The Plaintiff, Georgia (Jo) A. Baldauf ("Baldauf"), alleges that she was assaulted, battered, and falsely arrested in a confrontation with Pittsboro Police Officer Clifton Davidson ("Davidson"), at a convenience store on January 27, 2003.  Baldauf subsequently filed a lawsuit on August 30, 2004, in Hendricks County Circuit Court.  Her

---

[1]  This Entry is a matter of public record and will be made available on the court's web site.  However, the discussion contained herein is not sufficiently novel to justify commercial publication.

complaint for damages names Davidson, Pittsboro Town Marshal Jesse Marlow[2] ("Marlow"), and the Town of Pittsboro ("Pittsboro") as defendants.  She asserts a cause of action under 42 U.S.C. § 1983 against the Defendants for alleged violations of her First, Fourth, and Fourteenth Amendment rights, and against Pittsboro for allegedly contributing to these constitutional violations by failing to train and supervise Davidson and Marlow.  She also names Davidson and Marlow in state counts of assault, battery, false arrest, false imprisonment, and violation of Baldauf's right of free speech under Article 1, Section 9 of the Indiana Constitution.[3]

The Defendants removed the complaint on September 24, 2004, to federal court. On February 16, 2005, this court denied Baldauf's request to certify the issues of police officer liability under the Indiana Tort Claims Act for excessive force and implied causes of action under the Indiana Constitution.  The court found that the issue of police officer liability for claims of excessive force was premature and that the Indiana Supreme Court has never recognized an implied right of action under the state constitution. Accordingly, the court granted the Defendants' motion for partial summary judgment,

---

[2]  The complaint refers to Marlow as chief of police.  The town marshal, a position appointed by the town council, is by law the town's chief of police.  Ind. Code § 36-5-7-4.
 Also, although the complaint and subsequent pleadings in this matter spell Marlow's name as listed on the complaint, his name is spelled with a final "e" in an Indiana Court of Appeals decision issued this year affirming his conviction for receiving stolen property but reversing his conviction for perjury.  *See Marlowe v. State*, Mem. Decision No. 32A04-0507-CR-396 (Ind. Ct. App. Aug. 3, 2006).  In the absence of any records or deposition testimony establishing the correct spelling, the court will spell his name as listed in this complaint and its pleadings.

[3]  Despite naming Marlow in her assault and battery claim (Compl. ¶ 26), Baldauf has dropped her contention that Marlow assaulted or battered her.  (*See* Baldauf Resp. Marlow 5 n.2. (writing, without explanation, "[t]he claim of assault and battery is brought against Defendant Davidson alone")).)

dismissing Baldauf's claim for damages resulting from an alleged violation of her free speech rights under the Indiana Constitution.

The Defendants filed separate motions on December 6, 2005, for summary judgment on Baldauf's remaining claims.  The motions were supported with citations to the record and accompanied by exhibits.  Baldauf filed her responses, also supported by citations and exhibits, on March 10, 2006.  The parties have since filed additional replies or surreplies.  The matter is now fully briefed and ripe for review.

The court rules as follows.

**Table of Contents**

I. PRELIMINARY ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A. Defendants' Motion to Strike Expert Witness Roger Clark . . . . . . . . . . . . . 1
    B. Defendant's Motion to Dismiss Any Excessive Bail Claim . . . . . . . . . . . . . 6

II. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    A. Baldauf's Confrontation With Davidson . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    B. Baldauf's Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    A. False Arrest and False Imprisonment Claims . . . . . . . . . . . . . . . . . . . . . . . 15
        1. Probable Cause Defeats Claims for False Arrest/Imprisonment . . . 15
        2. When Probable Cause Becomes an Issue of Law . . . . . . . . . . . . . . 17
        3. Constitutional Framework for § 1983 Claims . . . . . . . . . . . . . . . . . . 17
        4. Disorderly Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        5. Battery on a Police Officer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    B. Excessive Force Claims Under the Fourth and Fourteenth Amendment . . 28
    C. First Amendment Violation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        1. Retaliatory Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        2. Suppression of Baldauf's In-Store Speech . . . . . . . . . . . . . . . . . . . . 42
    D. Conspiracy Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
    E. Municipal Liability Under § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
        1. Liability for Unconstitutional Policy, Practice, or Act by Policy-maker
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
        2. Failure to Train and Failure to Supervise Claims . . . . . . . . . . . . . . . 47
    F. State Assault and Battery Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
        1. Assault and Battery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
        2. Individual Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
        3. Governmental Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

# I.  PRELIMINARY ISSUES

## A.  Defendants' Motion to Strike Expert Witness Roger Clark

The admission of expert testimony is controlled by Federal Rule of Evidence 702 and the principles announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  As a threshold matter, the court must determine whether 1) the testimony will assist "the trier of fact to determine a fact in issue," and 2) that it "rests on a reliable foundation."  *United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000) (quoting Fed. R. Evid. 702 and *Daubert*, 509 U.S. at 597).

The Defendants argue in part that the report of Baldauf's proposed expert witness, Roger Clark ("Clark"), is inadmissible because it is not based on any articulated theory, methodology, or standard.  (Defs.' Br. Supp. Mot. Strike 5.)  They suggest also that it is inadmissible because it is not science, soft or hard.  (*See id.* at 3-4, 14.)  This suggestion is erroneous.  As even the Defendants acknowledge (*id.* at 2), Rule 702 not only allows expert testimony based on science but also on "technical, or other specialized knowledge," Fed. R. Evid. 702.  Moreover, the rule "specifically contemplates the admission of testimony by experts whose knowledge is based on experience."  *Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000) (affirming trial court's decision to allow an electrical engineer with extensive experience in electrical safety to testify as an expert witness about his inspection of a rail yard tower).

The Seventh Circuit has held that police officers may provide admissible expert testimony even when it is "entirely descriptive rather than based on empirical study of any sort (where the so-called *Daubert* test would be more helpful, particularly in distinguishing between 'real science or junk (courtroom) science.')"  *Lawson v. Trowbridge*, 153 F.3d 368, 375-76 (7th Cir. 1998) (quoting *United States v. Williams*, 81 F.3d 1434, 1441-42 (7th Cir. 1996).  Knowledge about police training is a specialized body of knowledge.  *Id.* at 376.  A police officer's testimony about that training can be helpful even when the testimony "'cover[s] matters that are within the average juror's comprehension.'"  *Id.* (quoting *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996)); *see also Cruz-Velasco*, 224 F.3d at 660 (noting that law enforcement officers may qualify as experts on matters of policing).

At first glance, Clark, a retired Los Angeles Police commander who also served for 19 months as a liaison to the Idaho Department of Juvenile Corrections, appears to possess, as does the Defendants' proposed expert, Steven D. Guthrie ("Guthrie"), a professional background that could be the basis of expert testimony about police procedures.  (*See* Pl.'s (4th) Desig. Evid. Attach. 35; Defs.' Desig. Evid. Ex. D.)

Establishing that an expert is qualified to testify about a particular subject matter does not end the court's responsibility, however.  The court must satisfy itself that the expert's opinions are derived from his or her expertise.  *See, e.g., United States v. Lanzotti*, 205 F.3d 951, 956 (7th Cir. 2000) (holding that a proposed expert who worked for state liquor control agency was not qualified to testify about a gambling issue).

2

Equally important, the court must be able to determine how the expert's area of special knowledge or expertise led to his opinions.

In *Huey v. United Parcel Service, Inc.*, 165 F.3d 1084, 1086 (7th Cir. 1999), a fired employee offered a specialist in human resource development, a "forensic vocational expert," to testify about whether the company had retaliated against him for complaining about racial discrimination in the workplace.  Much like the experts in this case, the specialist reviewed the record as provided by the party.  *Id.*  He offered his conclusion, based on his "professional experience and training and exposure to current laws and regulations as an employment agent for over thirty years."  *Id.*  The Seventh Circuit upheld the district court's decision to exclude the witness – not because the proposed testimony did not meet the framework of *Daubert* but for a more fundamental reason.  *Id.* at 1087.  The expert failed to show how his conclusions were drawn from his expertise.  *Id.*  "[A]n expert who supplies nothing but a bottom line supplies nothing to the judicial process."  *Id.* (quoting *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989)).

Here is where Defendants' protests sound most strongly.  Clark's report offers the slimmest of hints as to how his conclusions, detailed in the analysis section of his report, are derived from his expertise.[4]  (*See* Clark Report 11-13.)  For example, Clark states, "The record is clear that Officer Davidson was the aggressor during this

---

[4]  To the extent that Clark's "Overview of Events" or Guthrie's "Understanding of Circumstances" contains references to facts otherwise inadmissible, the court considers such materials for the limited purpose of understanding the records that were reviewed.  *See* Fed. R. Evid. 703.

3

incident." (*Id.* at 11.)  He supports this assertion by stating that Davidson "deliberately approached Ms. Baldauf and confronted her – not that Ms. Baldauf approached and confronted Officer Davidson." (*Id.*)  This is merely one conclusion resting on a second.

Clark offers similar judgments about defendants Marlow and Pittsboro.  He states that "the facts of this case demonstrate" that Marlow contrived a cover-up scheme, and that "the record also outlines undisputable facts" linking a town board member to "acts of police corruption." (*Id.* at 12.)

Conclusory statements without explanation offer little value to the court.[5]  This is not to say that expert testimony regarding police procedures might not be helpful under some circumstances.  A police expert, for example, might outline accepted or proper police procedures in dealing with angry or potentially disorderly citizens, encountering disturbed relatives of an arrestee, or responding to derisive comments regarding the officer's department.  Or an expert might explain the symptoms and signals of a police officer in need of remedial supervision or training, or about accepted hiring screens.  In either context, the expert could then testify how the facts reviewed depart or adhere to such procedures, standards, or acceptable practices.  Yet this sort of analysis is lacking in Clark's report.[6]

_____

[5]  In the same fashion Guthrie's report builds on the assumption that Davidson's, rather than Baldauf's, version of events is correct.  (*See, e.g.*, Guthrie Report 7.)  He does, however, provide testimony regarding the training of police officers in the application of force and his expert opinion, that under a certain set of facts, Davidson's responses were within the parameters of acceptable policing.  (*See* Guthrie Report 7-8, 10-12.)

[6]  In support of her response to Defendants' motion, Baldauf has attached portions of Clark's deposition.  These materials help explain how Clark drew on his police experience to

(continued...)

4

As the Defendants note, Clark's report also strays into issues of law.  Clark states, for example, that because "Davidson was out of uniform and off-duty in a public place, and conducting personal business . . . he had no authority to order another private person (Ms. Baldauf) to leave a public place (Crystal Flash.)"  (Clark Report 11.)  Later, he says, "Ms. Baldauf had every right to push his finger away from her face because she felt threatened."  (*Id.*)  With regard to defendant Pittsboro, Clark states that a town board member had a duty to report official misconduct.  (*Id.* at 12.)

As a general rule, expert testimony is limited to matters that would help the trier of fact "understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Although the Seventh Circuit has held that an expert can offer a legal opinion about some matters, "Federal Rules of Evidence 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case."  *United States v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996).  Clark's opinions about Davidson's authority to order Baldauf to leave, about Baldauf's right to push away Davidson's finger, and about the duty of a Pittsboro town council member are, for the most part, issues of law reserved for the court and suitable for jury instructions.[7]  They are not appropriate subjects of expert testimony.

---

[6](...continued)
judge the credibility of the materials provided him.  (Clark Dep. 44-47, 120, 126-129.)  Credibility is a determination generally reserved for the trier of fact.  *See United States v. George,* 363 F.3d 666, 675 (7th Cir. 2004).  However, given the proper foundation, such expert testimony might be helpful in assisting a jury in determining how a police supervisor should evaluate the police misconduct reports.

[7]  Similarly, Guthrie's report conveys his opinions regarding the Supreme Court's holding in *Graham v. Connor*, 490 U.S. 386 (1989) and the law governing the use of excessive force.  (Guthrie Report 7-8.)

5

As Baldauf notes, experts may provide their opinions on ultimate issues.  *See* Fed. R. Civ. P. 704.  They may even offer "naked opinions." [8]  *See* Fed. R. Evid. 705; *Mid-State Fertilizer Co.*, 877 F.2d at 1339.  However, when an expert fails to articulate how his judgments are derived from his area of specialized knowledge, he or she runs the risk that a court will find the testimony to be of no assistance to the trier of fact.

For these reasons, the court **GRANTS** Defendants' motion to strike Clark's report from the record that will be considered in ruling on the motions for summary judgment.[9]

### B.  Defendant's Motion to Dismiss Any Excessive Bail Claim

Baldauf's complaint states that the Defendants "caused bail to be set at an excessively high amount as further punishment and in an attempt to further humiliate" her.  (Complaint ¶ 25.)  Her complaint did not allege a cause of action stemming from this conduct, and Baldauf has stated that she included this information only as a "factual

---

[8] One such naked opinion is Clark's statement that twisting Baldauf's arm behind her back and placing her in a "hammer-lock" was "an egregious physical abuse" under the circumstances Davidson confronted, and any competent police administrator would have disciplined him for this conduct.  (*See* Clark Report 11-12.)

[9] This ruling does not preclude the offer of Clark as an expert witness at trial, and if so qualified, the use of Clark's report for any admissible purposes, such as impeachment.  The Federal Rules of Civil Procedure require a party to disclose an expert's testimony before trial. Fed. R. Civ. P. 26(a)(2).  This disclosure shall include a written report providing, among other things, "a complete statement of all opinions to be expressed and the basis and reasons therefor."  *Id.*  A party who fails to disclose the required information is not permitted to use the expert witness' testimony, "unless such failure is harmless."  Fed. R. Civ. P. 37(c)(1).

Although Clark's report contains "bottom line" conclusions providing little explanation on how his police expertise formed his judgment, Clark testified, directly or indirectly, in his deposition about police procedures.  (*See, e.g.*, Clark Dep. 119-20, 126-31; Baldauf Resp. Opp'n Mot. Strike 5.)  The deposition was taken December 16, 2005.  The deadline for objecting to or seeking to exclude expert witness testimony was extended to sixty days prior to the final pretrial conference.  (Magistrate Judge's Order of January 26, 2006.)

allegation and not as a separate claim for relief." (Baldauf Resp. Davidson 28.)   Thus, there is no claim before the court to affirm or deny.  The court therefore **DENIES** Defendant Davidson's motion to the extent that he requests summary judgment on a non-existent claim.

## II.  BACKGROUND

The following facts do not indicate the court's view on the events that actually transpired.  Rather, this section presents an account drawn from facts presented by Baldauf that are supported by affidavit or other evidence and undisputed facts presented by the Defendants.  For the purposes of summary judgment, "[t]he court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the non-moving party." *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs*, 433 F.3d 1024, 1030 (7th Cir. 2006).  The following, then, is merely an account of the events that a trier of fact could determine to have happened, based on the admissible evidence before the court at this juncture.

### A.  Baldauf's Confrontation With Davidson

On January 27, 2003, Davidson, an off-duty Pittsboro police officer, was the only customer inside the Crystal Flash, a Pittsboro gas station and convenience store, when Baldauf entered the store shortly after 4 p.m.  (Compl. ¶¶ 10-11; Defs.' Ex. L at 1.)[10] Davidson was bantering with Dea M. Albright, one of the two female attendants.

---

[10]  All citations hereafter to briefs, responses, replies, exhibits, or attachments are references to documents filed in connection with the summary judgment motions.

7

Baldauf, a 52-year-old resident and county commissioner of neighboring Boone County, went to the fountain to get a soft drink.

Accounts differ on what happened next but the differences are slight, except for Officer Davidson's account.[11]  However, some context is helpful to understand the subsequent comments between the officer and Baldauf.

Two days earlier, on January 25, 2003, Baldauf's 22-year-old son had been arrested by Davidson and others, and charged with possession of marijuana and driving while intoxicated.  (Baldauf Dep. 33-35.)  The son had complained to Baldauf about being shoved repeatedly by the officers.  (*Id.* at 37.)  At the time of the Crystal Flash encounter, Davidson was aware that someone had complained to Marlow about a recent arrest.  (*Id.* at 47.)

After Baldauf entered the store, she overheard Davidson say, in response to the attendant's tease or verbal jab, "What do you mean? I'm a peacemaker," or words to that effect.  (*Id.* at 31.)  Soon thereafter, she interjected, "If you're with the Pittsboro Police Department, it's more like Gestapo."  (*Id.*)

---

[11]  Although portions of Officer Davidson's deposition have been submitted to the court, none describes his account of what happened in the Crystal Flash.  A probable cause affidavit that Davidson completed for Baldauf's arrest, which was submitted, does relate his version of events.  (*See* Defs.' Ex. L.)  The affidavit was included to substantiate Davidson's argument that his account of the events "is consistent with Baldauf's recollection of the events, with exception to a few minor difference (sic) of memory."  (Davidson Br. 16-17.)  In this regard, the affidavit does not serve its purpose. The affidavit describes an encounter markedly different in key, material details from the one described by Baldauf, which the court has adopted, but only for the purpose of deciding if summary judgment is appropriate.

Davidson, who at some point identified himself as a Pittsboro police officer, walked "very, very close" to Baldauf and asked her, "[W]hat do you mean by that?"  (*Id.* at 37.)  Baldauf replied, "[P]eople can be arrested without being roughed up."  (*Id.*)  Baldauf then apologized, saying, "I'm sorry. I shouldn't have said what I did," and attempted to walk away.  (*Id.* at 40.)

Davidson moved in front of her and "refused to let [her] pass."  (*Id.* at 44.)  "He said, no, no, I want to hear what your problem is with the police."  (*Id.*)  Baldauf tried to step past Davison two more times, telling him at least once that the conversation was over, but each time Davidson blocked her way.  (*Id.* at 44-46.)  Finally she "squeezed" past him by moving around a display.  (*Id.* at 46.)

Baldauf said she moved toward the counter to pay for her drink when Davidson came up behind her and said, "[O]h, I know who you are. . . .  [Y]ou're the one who complained to Marlow about me."  (*Id.* at 47.)  Baldauf denied that she was the complainant, but Davidson continued to act as if she was.  (*Id.* at 54.)

> He began to taunt me, saying I suppose you're one of those mothers that thinks that your son never does any wrong.  And I said, no, I know my son did wrong. But you did wrong, too.  And he said, what did I do wrong?  And I said, you were shoving him around.  It didn't merit shoving him around.  And I turned my back – I said this conversation is over, and I turned my back to step up to the counter. And Cliff [Davidson] did not push me hard, but he put both hands on my shoulders and gave me a shove and said, lady, get your [expletive omitted] and get out of here.

(*Id.*)

9

This account is supported in part by another customer, Nicole Buchanan, who said that Davidson was "hollering" at Baldauf when Buchanan entered the store. (Buchanan Dep. 13.)  "[I]t caught my attention for me to stop and like look as to what in the world is going on here."  (*Id.*)  She heard Baldauf say a couple of times, as Davidson was yelling, "this conversation is over, just please leave me alone, something in that line."  (*Id.* at 14.)  Buchanan did not see Davidson push or touch Baldauf.  (*Id.* at 15.)  However, she did see Davidson, a large man, hovering over her.  (*Id.*)

Although Buchanan did not hear Baldauf raise her voice until Buchanan was walking out (*id.*), attendant Albright said both Davidson and Baldauf were getting louder as they talked and that both were yelling by the time they reached the cash register, (Albright Dep. 93).

Baldauf said she turned around after Davidson shoved her.  "I told him that I was not finished making my purchases and to get away from me, to shut up and leave me alone."  (Baldauf Dep. 56.)  She was becoming scared.  (*Id.*)  "He was asking who I was, and I was more afraid than anything because I was afraid of retribution, retaliation on my family, and we go to Pittsboro a lot."  (*Id.*)

Davidson then "put his finger in [her] face."  (*Id.* at 57.)  Baldauf said she pushed Davidson's finger aside and again told him to leave her alone.  (*Id.*)  "[H]e stood back for a minute.  And then he reached for my left arm, and he took it and he held it in each hand for a minute trying to figure out what to do."  (*Id.*)

10

Baldauf said Davidson's face was red and he was screaming as he twisted her arm behind her back.  (*Id.*)  "He was telling me, do you know I can arrest you for assault."  (*Id.*)  He then shoved her against the counter.  (*Id.* at 62.)  (Although Buchanan did not see Davidson grab Baldauf's arm or wrist, attendants Tabatha Johns and Albright saw the officer move her arm behind her back.  (Johns Dep. 45; Albright Dep. 81.)  Albright recalled him forcing Baldauf against the counter.  (Albright Dep. 81-82.))  Davidson told Baldauf that if she collected her stuff and left, he would let her go.  (Baldauf Dep. 62-63.)

Baldauf asked for a pack of cigarettes, paid for her purchases, and left.  (Baldauf Dep. 63.)  Before leaving, though, she told Davidson that she was going to file a complaint against him, and that she would go find the town marshal as soon as she left.[12]  (*Id.*)  Davidson replied that nothing would happen to him.  (*Id.*)  As soon as Baldauf left, he asked to use the store's telephone.[13]  (Albright Dep. 60.)

Outside, Buchanan, who already had left the store, pulled her car up beside Baldauf.  (Baldauf Dep. at 66.)  Baldauf recognized Buchanan as an employee of a beauty shop she patronized.[14]  (*Id.* at 53.)  Buchanan rolled down her window and asked when this sort of conduct was going to end.  (*Id.* at 66.)  "And I said was she

---

[12]  Albright remembers Baldauf threatening Davidson in more scatological terms as she departed.  (Albright Dep. 60.)

[13]  Johns recalled that Davidson made the call "on the cell phone that he had."  (Johns Dep. 49.)

[14]  In Baldauf's deposition, Buchanan is referred to as "Miss Ingram."  (*See* Baldauf Dep. 53.)  As neither party has explained the discrepancy, the court infers that Ingram changed her name as a result of marriage or some other circumstance.

going to complain on them at any time because if she was going to go, like a town meeting or whatever, I would like to go down there and voice my opinion on some things about what I've witnessed." (Buchanan Dep. 17-18.) Baldauf told her she was going to file a complaint, and Buchanan drove away. (*Id.* at 18.)

Baldauf, realizing she had not received her change, reentered the store. (Baldauf Dep. 67.) Davidson, who was still on the phone, called out, "I told you to get out of here." (*Id.*) Baldauf replied that she was just getting her change and, as she was leaving, accused him of calling his boss to cover himself. (*Id.*) She told him again that she was leaving to find his boss and register a complaint.[15] (*Id.*)

Inside the store, Davidson finished his telephone call and told Johns that he had talked to Marlow. (Johns Dep. 49.) Davidson said the marshal had instructed him that he should have arrested Baldauf.[16] (*Id.* at 48-49.)

### B. Baldauf's Arrest

Baldauf drove to the Pittsboro Police station, where she met with Marlow and told him that she wanted to file a complaint. (Baldauf Dep. 71.) Marlow said he had just talked to Davidson, and he asked Baldauf to tell him what happened. (*Id.* at 72.) After hearing her story, he told her that "he saw nothing that merited taking a complaint." (*Id.*

---

[15] At some point, Baldauf identified herself as a Boone County commissioner and told Davidson that she knew several Pittsboro town council members. (Baldauf Dep. at 68.)

[16] Defendants concede that Marlow advised Davidson that he should have arrested Baldauf but contend that John's statement to this effect is inadmissible hearsay. (*See* Defs. Reply ¶ 66 at 14.) Not so. Fed. R. Evid. 801(d)(2).

at 74.)  The two argued briefly about the police force's reputation.  (*See Id.* at 73-78 *passim.*)

As Baldauf attempted to leave, Davidson arrived, blocked her exit, and told her that she was under arrest.[17]  (*Id.* at 78.)  Marlow asked Davidson if he was sure that he wanted to arrest Baldauf, and the two officers disagreed about who should arrest her.  (*Id.* at 78-79.)  Baldauf was handcuffed, and then the officers left Marlow's office and Baldauf heard them arguing about her arrest.  (*Id.* at 80.)  Marlow appeared to be "very uncomfortable" about Baldauf's arrest.  (*Id.* at 81.)

Marlow, accompanied by Davidson, drove Baldauf to the Hendricks County Jail.  (Defs.' Ex. L 2.)  En route, Baldauf, Marlow and Davidson continued to talk and argue about the confrontation in the Crystal Flash and related issues.  (See Defs.' Ex. M *passim.*)  Their conversation was recorded by a microphone that Marlow had triggered at some point.  (Marlow Dep. 162-63.)

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[17]  The court will assume, as both Defendants and Baldauf contend, that Davidson arrested her at that point for battery and disorderly conduct.  (Davidson Br. Supp. ¶ 25 at 4 (the first of two paragraphs numbered "25" in the brief); Baldauf Resp. Davidson 8.)  However, the supporting exhibits do not indicate when the decision to charge Baldauf with disorderly conduct was actually made.  A transcript of a taped conversation among Baldauf, Marlow, and Davidson suggests the decision to charge her with disorderly conduct was made while the officers were transporting her to jail or later.  (*See* Defs.' Ex. M 21.)

a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).  An issue of fact is material if it could affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine if a

reasonable fact finder could find for the nonmoving party.  *Hottenroth v. Village of

Slinger*, 388 F.3d. 1015, 1027 (7th Cir. 2004).  Only factual disputes that might affect

the outcome of the suit under the governing law will preclude summary judgment.

*Anderson*, 477 U.S. at 248.  If there is evidence that would allow a reasonable jury to

return a verdict for the non-moving party, then summary judgment is not appropriate.

*Id.*

        When deciding a motion for summary judgment, the court must consider all

evidence, and draw all reasonable inferences therefrom, in the light most favorable to

the nonmoving party.  *See Anderson*, 477 U.S. at 255.  The moving party "bears the

initial responsibility" of identifying specific facts within the record that "demonstrate the

absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  When a motion

for summary judgment is made and properly supported, the non-moving party may not

rest on the pleadings or denials but must set forth the specific evidence showing there is

a genuine issue of material fact that requires a trial.  Fed. R. Civ. P. 56(e).  A mere

scintilla of evidence will not do.  *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir.

2001) (citing *Anderson*, 477 U.S. at 252).

        A motion for summary judgment is the moment in a lawsuit "when a party must

show what evidence it has that would convince a trier of fact to accept its version of

events."  *Schacht v. Wis. Dep't of Corrs.*, 175 F.3d 497, 504 (7th Cir. 1999), *overruled*

14

*on other grounds by Higgins v. Mississippi*, 217 F.3d 951, 954 (7th Cir. 2000).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."  *Celotex*, 477 at 323-24.  At the summary judgment stage, the judge's function is "to determine where there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## IV.  DISCUSSION

### A.  False Arrest and False Imprisonment Claims

#### 1.  Probable Cause Defeats Claims for False Arrest/Imprisonment

Baldauf alleges that Davidson and Marlow violated her Fourth and Fourteenth Amendment rights by falsely arresting her.[18]  A false arrest charge can stand only if the officer or officers involved had no probable cause to make an arrest.  *Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003).  "It is well settled that the actual existence of probable cause to arrest precludes a § 1983 suit for false arrest."  *Id.* (quoting *Juriss v. McGowan*, 957 F.2d 345, 349 n.1 (7th Cir. 1992)).

This is true whether probable cause exists on all of the charges brought against a person, on only one charge, or on a closely related offense.  *Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993); *Richardson v. Bonds*, 860 F.2d 1427, 1430 (7th Cir. 1988)

---

[18]  The Fourth Amendment guarantees the right of people to be secure from arrest that is not supported by probable cause. U.S. Const. amend IV.  The Fourteenth Amendment, in addition to requiring state and local authorities to observe Fourth Amendment protections and other rights, prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. amend XIV, § 1.

(stating that probable cause is determined not by examining the officer's view of the legal basis for the arrest but whether "a reasonably competent police officer, with the facts actually known by the arresting officer, would have concluded that probable cause existed to arrest for the offense offered as justification" for the arrest).

Here, the battery on a police officer and disorderly conduct charges are closely related, stemming generally from the same operative facts, as shown by Davidson's probable cause affidavit.  (Defs.' Ex. L.)  So if Davidson or Marlow can demonstrate probable cause for arresting Baldauf on either charge, her Fourth Amendment claim fails.

Baldauf's state claims of false arrest and false imprisonment rise or fall similarly.  Indiana law specifically states that a police officer may arrest a person when the officer has probable cause to believe that the person is committing or attempting to commit a misdemeanor in the officer's presence.  Ind. Code § 35-33-1-1(a)(4).  As with a Fourth Amendment false arrest claim, the existence of probable cause defeats a state claim, also.  *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104-05 (Ind. Ct. App. 2002).

In this case, Baldauf's false imprisonment claim is inseparably linked to her false arrest claim.  False imprisonment is an unlawful restraint of one's freedom of movement or deprivation of liberty without consent.  *Id.* at 1104.  Baldauf has alleged no facts showing any material change in circumstances or facts between the time of her arrest and her release shortly afterward from the Hendricks County Jail.  Her false imprisonment claim therefore hinges on her ability to show that her arrest was unlawful.

### 2. When Probable Cause Becomes an Issue of Law

Baldauf asserts that probable cause issues usually involve questions of fact for a jury, and therefore false arrest claims brought under § 1983 are generally not suitable for summary judgment.  However, as the cases she cites point out,[19] the existence of probable cause is a "matter of law 'when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'"  *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996) (quoting *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994)); *see also Banish v. Locks*, 414 F.2d 638, 641 (7th Cir. 1969).  Moreover, the notion that the issue of probable cause is generally a jury question understates the current structure for deciding claims of constitutional or statutory violations brought against police and other officials.

### 3. Constitutional Framework for § 1983 Claims

Qualified immunity is a doctrine of American law that protects police and other officials from reasonable mistakes in judgment in the exercise of their duties.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 816-17 (1982); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).  The doctrine balances the need to vindicate constitutional rights against the social costs of litigation generally and the danger specifically that fears of litigation will emasculate officials in their willingness to carry out their duties properly and even boldly when necessary.  *Harlow*, 457 U.S. at 813-14.  The Supreme Court has balanced these competing values by providing most government officials, including

---

[19]  Baldauf Resp. Davidson 11.

17

police officers, with immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818.

As developed in subsequent cases,[20] this doctrine requires the court, in a § 1983 cause of action brought against a police officer, to determine first whether the officer's conduct, as alleged or supported by the plaintiff's evidence, would violate a constitutional right. *Saucier  v. Katz*, 533 U.S. 194, 201 (2001).  In so doing, the court may state those principles that should guide officers confronting similar situations in the future.[21]  *Id.*

If a violation "could be made out on a favorable view of the parties' submissions," the court then moves to the second step: determining whether the right was clearly established in view of the "specific context of the case."  *Id.*  This is usually the heart of a qualified immunity analysis because officials are only protected against reasonable mistakes in judgment.  A violation of a constitutional right that is clearly established with regard to the specific conduct at issue is almost certainly unreasonable.[22]  *See Harlow*,

---

[20]  *See generally Anderson v. Creighton*, 483 U.S. 635; *Hunter v. Bryant*, 502 U.S. 224 (1991); *Saucier v. Katz*, 533 U.S. 194 (2001).

[21]  Although phrased as a suggestion, the Court seemed to urge courts to set forth their reasons. The Court stated:
> In the course of determining whether a constitutional right was violated, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established.  This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry.

*Saucier*, 533 U.S. at 201.

[22]  An official may still escape liability if he claims "extraordinary circumstances and can
(continued...)

18

457 U.S. at 819 (explaining that "a reasonably competent public official should know the law governing his conduct").

It is the first step – the determination of whether the officer's conduct violates a constitutional right – that requires the court to assay the facts.  The Supreme Court has repeatedly instructed courts that qualified immunity is an issue of law, to be determined by the trial court as soon as possible.  *See*, *e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  This mandate requires the court, in a false arrest case, to decide whether the facts, viewed in a light most favorable to the injured party, could support a claim that the officer or officers lacked probable cause to make the arrest.  In this respect, probable cause is a preliminary issue of law.[23]

---

[22](...continued)
prove that he neither knew nor should have known of the relevant legal standard."  *Harlow*, 457 U.S. at 819.

[23] Under the *Saucier* framework, the court asks in a false arrest claim whether the facts, viewed in the light most favorable to the plaintiff, would support a finding of no probable cause, i.e., a constitutional violation.  *See Saucier*, 533 U.S. at 201.  If the answer is "yes," the court must determine, under those facts, if a reasonable officer would have clearly known that probable cause did not exist.  *Id.*  Only if the answer to this second question is also "yes," does the existence of probable cause become a jury question.  *See Biddle*, 992 F.2d at 676; *but compare Brosseau v. Haugen*, 543 U.S. 194, 201-02 (Breyer, J., dissenting) (declaring concern that this two-step "order of battle" that *Saucier* requires courts to follow makes little administrative sense if the court can resolve the case more easily by deciding qualified immunity first).  Justice Breyer, joined by Justices Scalia and Ginsburg, also noted that the *Saucier* framework leads to constitutional decisions that are "effectively insulated from review."  *Id.*  The decisions are presumably sheltered from review because they are dicta.  *See* n.21 *supra*.

*4.  Disorderly Conduct*

As noted above, Baldauf was charged with disorderly conduct and battery on a

police officer, and if Davidson or Marlow had probable cause to arrest her on either of

those charges or any closely related charge, then her arrest did not violate the Fourth

Amendment, the federal and state false arrest and false imprisonment claims fail, and

Davidson and Marlow are entitled to qualified immunity with respect to these claims.

Probable cause does not require proof beyond a reasonable doubt or even proof

by a preponderance of the evidence.  *Braun v. Baldwin*, 346 F.3d 761, 766 (7th Cir.

2003).  Rather, the issue is merely whether, at the time of the arrest, the arresting

officer was aware, either from his own observation or from a reasonably trustworthy

source, of facts that would lead a prudent person into believing that the suspect had

committed or was committing a crime.  *Marshall ex rel. Gossens v. Teske*, 284 F.3d

765, 772 (7th Cir. 2002).  Put another way, "[s]o long as the totality of the

circumstances, viewed in a common sense manner, reveals a probability or substantial

chance of criminal activity on the suspect's part, probable cause exists."  *United States*

*v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001).

Neither Davidson nor Marlow had probable cause to arrest Baldauf for disorderly

conduct, when viewing the evidence in Baldauf's favor.  In Indiana, a person commits

disorderly conduct by (1) engaging in fighting or tumultuous conduct, (2) continuing to

make an unreasonable noise after being asked to stop, or (3) disrupting a lawful

assembly of persons.  Ind. Code § 35-45-1-3.  Davidson's probable cause affidavit is

unclear as to which section of the statute it refers.  (*See* Baldauf Resp. Davidson Mot. 11; Defs.' Ex. L.)  However, none of the facts suggest that Baldauf was fighting or engaged in tumultuous conduct, which are actions that cause or are likely to cause serious bodily injury or substantial property damage.  *See* Ind. Code § 35-45-1-1.  Nor were the two attendants in the store, Davidson, and at times, Buchanan, "a lawful assembly" as the statute envisions.  *See D.R. v. State*, 729 N.E.2d 597, 599 (Ind. Ct. App. 2000) (describing a "lawful assembly," which is undefined by statute, as "a group of people meeting for a specific purpose).

Davidson argues that a reasonable officer had reason to believe that Baldauf was engaging in disorderly conduct because she disobeyed his command to stop yelling.[24]  (Davidson Br. 8-9.)  However, the only submitted evidence that he had made such a command is Davidson's probable cause affidavit.[25]  (*See* Defs.' Ex. L.)  Baldauf disputes the assertion, citing testimony from Baldauf and the attendants that states or strongly suggests that the circumstances were just the opposite: Baldauf was asking Davidson to be quiet.  (Baldauf Resp. Davidson 12.)  Such evidence would be sufficient

---

[24]  The material issue here is whether Davidson, or anyone serving in an official capacity, asked Baldauf to be quiet. *See Mitchell v. State*, 813 N.E.2d 422, 430 (Ind. Ct. App. 2004) (declaring that conviction for disorderly conduct requires proof of an "official warning"). Disobeying a police command, outside of certain areas such as traffic enforcement, is not, *per se*, unlawful in Indiana.  *See, e.g.*, *Davis v. State*, 672 N.E.2d 1365, 1368 (Ind. Ct. App. 1996) (overturning conviction for disorderly conduct because the refusal to obey a police order did not rise to tumultuous conduct); *Ajabu v. State*, 704 N.E.2d 494, 495 (Ind. Ct. App. 1998) (noting that a charge of resisting law enforcement requires evidence of force).  *But compare Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997) (finding probable cause to arrest a protestor for resisting or attempting to resist because "an officer has a right to enforce a lawful order" when a person "makes a movement in furtherance of his goal of disobedience").

[25]  Defendant Davidson does not assert in his statement of material facts that Davidson asked Baldauf to stop yelling or calm down, and the argument of Davidson's brief contains no citations to the record.

to sustain a claim that Davidson violated Baldauf's constitutional right to be free from unlawful arrest – if disorderly conduct had been the only grounds for her arrest.  It was not.

### 5.  Battery on a Police Officer

In Indiana, a person commits criminal battery by knowingly or intentionally touching another person in a rude, insolent, or angry manner.  Ind. Code § 35-42-2-1.  If the person touched is a law enforcement officer "engaged in the execution of the employee's official duty," the conduct is battery on a police officer.  *Id.* § 35-42-2-1(a)(1)(B); *accord Tapp v. State*, 406 N.E.2d. 296, 298-99 (Ind. Ct. App. 1980).

Here two issues arise.  Did Baldauf touch Davidson in a rude, insolent, or angry manner when, as she alleges, she merely pushed his finger away from her face?  Secondly, was Davidson engaged in the execution of his duties when Baldauf pushed his finger?  The issues are, it turns out, closely related.

Baldauf argues that she did not touch Davidson in a rude, insolent, or angry manner because she was just frightened and reacting defensively to his "thrusting his finger" at her face.[26]  (Baldauf Resp. Davidson Mot. 15.)  From her viewpoint, despite her attempts to withdraw from any confrontation, Davidson continued to badger and yell at her, shoved her, and then pointed his finger at her, in front of her face and in a

---

[26]  Baldauf never states whether Davidson's finger touched her face (although it seems highly unlikely that any physical touching would have gone unmentioned) or how close his finger came to her body.

22

threatening fashion.  She was worried and fearful.  She alleges that the absence of any

rudeness, insolence, or anger on her part negated any claim of probable cause.  (*Id.* at

16.)  Such reasoning seems sound, but it does not accurately reflect the law.

In Indiana, any slight touching of another person or that person's apparel, may

constitute battery.  *Impson v. State*, 721 N.E.2d 1275, 1285 (Ind. Ct. App. 2000)

(upholding a battery conviction when the defendant knocked a person's glasses off by a

light smack that did not touch the face); *Mishler v. State*, 660 N.E.2d 343, 348 (Ind. Ct.

App. 1996) (affirming the battery convictions of two bondsmen who bumped a resident,

knocking her off balance, as they forced their way into her home); *Shaw v. State*, 156

N.E.2d 381, 382 (Ind. 1959) (declaring that "any touching, however slight, may constitute

assault and battery").

Of even more importance to this case, virtually any intentional touching of a law

enforcement officer may be judged "insolent."  *See K.D. v. State*, 754 N.E.2d 36 (Ind. Ct.

App. 2001).  In *K.D.*, the Indiana Court of Appeals upheld a juvenile court decision that a

15-year-old high school student committed battery by pulling or yanking on a police

officer's gun belt.[27]  *Id.* at 41.  Although the youth claimed that he was merely "joking,"

the juvenile court concluded that the youth acted "in an insolent manner by boldly

disregarding the authority of the school police officer."  *Id.*  The appellate court agreed,

noting that "insolent" has been defined as "lacking usual or proper respect for rank or

---

[27]  The student disputed the sufficiency of evidence regarding his age.

position." *Id.* (citing Webster's Third New International Dictionary Unabridged 1170 (1967)).  The court affirmed a six-month sentence to the state correctional system.  *Id.*

Baldauf does not dispute that she pushed aside Davidson's finger.  She claims, however, that she did not commit battery because she did not touch his finger in a rude, insolent, or angry manner.  While the evidence, viewed in her favor, might support her claim that she was not being rude or angry, she has acknowledged knowing that Davidson was a police officer and touching him in a way that a prudent person, knowing the law as *K.D.* instructs, would view as insolent.  This is all that probable cause demands.

Although the court could end its analysis here, Baldauf's argument deserves more attention.  She suggests that Davidson lacked probable cause because the charge of battery on a police officer requires that the officer be "engaged in the execution of his official duty."  This alone – a missing requirement of the specific charge – would not demonstrate the absence of probable cause.  Probable cause existed even if Davidson was not engaged in his official duties so long as sufficient facts at the time of Baldauf's arrest would have led a reasonable police officer to believe that a closely related offense, such as battery in general, had been committed – whether charged or not.  *See Biddle v. Martin*, 992 F.2d 673, 676 (7th Cir. 1993).

Viewed from the perspective of *K.D.*'s holding, however, one could argue that because Davidson was not engaged in his official duties, pushing aside his finger did not demonstrate a lack of respect for his rank or position, and therefore probable cause did

24

not exist for a general battery charge.  To the extent that this suggests that not every touching of a police officer is necessarily insolent, the court agrees.  For example, if an officer was met by his or her ex-spouse, and in the course of a normal discussion, the ex-spouse patted the officer's arm, the officer would not have probable cause to arrest the ex-spouse for battery when the conversation subsequently turned hostile.  But this sort of situation is not before the court.

Baldauf initiated a conversation with Davidson in his capacity as a police officer.  Davidson responded – angrily, aggressively, and loudly, if Baldauf is to be believed.  Yet, according to her own submitted evidence and statement of material facts, Baldauf was yelling, also.[28]  By her account, Davidson then shoved her and ordered her out of the store.  Clearly at this point, he was behaving as a police officer – whether exercising or flaunting his authority.  Indiana law invests town marshal deputies with what the Seventh Circuit terms a "community caretaking" function.  *See* Ind. Code § 36-5-7-4(3) (imposing a duty on town marshals and their deputies to suppress breaches of the peace); *Finsel v. Cruppenink*, 326 F.3d 903, 907 (7th Cir. 2003) (noting that Illinois and other states impose a duty on law enforcement officers to maintain public order).

As Defendants correctly point out, the nature of the officer's acts, not whether the officer is on or off duty, determines if the officer is engaged in the execution of his official

---

[28]  In her "Statement of Material Facts in Dispute," Baldauf supplemented Davidson's facts with those "necessary for the Court to rule on Marlow's [sic] motion." (Baldauf Resp. Davidson 2 n.1.)

25

duty.  *Nieto v. State*, 499 N.E.2d 280, 282 (Ind. Ct. App. 1986).[29]  At least by this point,

Davidson was engaged in his official duties and could reasonably consider Baldauf's

touching of his finger to be insolent.  Whether it actually was insolent was a separate

issue to be resolved by any subsequent criminal proceedings.  The outcome of those

proceedings, however, was immaterial as to whether probable cause existed for her

arrest.  *See Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003).

There is one more argument to be addressed.  Baldauf protests that "Davidson

can hardly bring charges against Baldauf for touching his finger when Baldauf touched

the finger to get it out of her face, and did so defensively rather than offensively."[30]

(Baldauf Resp. Davidson 16.)  Although Baldauf makes this statement to support her

claim that she was not rude, angry, or insolent, her protest can also be viewed as a plea

---

[29]  An officer's own prior culpability is generally irrelevant in this determination.  *See, e.g.*, *McKinley v. State*, 465 N.E.2d 742, 744-47 (Ind. Ct. App. 1984).  In *McKinley*, the Indiana Court of Appeals reversed a motorist's conviction for attempted battery because the trial court improperly excluded evidence showing that the police officer may have been motivated by road rage and the motorist may have only been defending himself.  *Id.*  Yet the court noted that the officer's identification of himself as a police officer and testimony that he wanted to speak to the driver because he was driving erratically were sufficient to consider his actions in performance of his duty.  *Id.* at 747 n.2.

*McKinley* involved a different standard of review than the standard in a summary judgment motion where all facts and inferences must be viewed in the non-moving favor's party.  Here, however, Baldauf acknowledges the officer's identification and an act (ordering her to leave the store) consistent with policing.  This is sufficient to establish that the officer was engaged in the performance of his duties.  To hold otherwise could require an inquiry into the propriety of the officer's actions and/or his subjective motivations in any case involving battery on a police officer.  This would defeat the statute's intent to afford greater protection to law enforcement officials who are subjected to special risks in the performance of their duties.  *Tapp v. State*, 406 N.E.2d at 300.  *See also Robinson v. State*, 814 N.E.2d 704, 708-09 (Ind. Ct. App. 2004) (noting that victims of police misconduct have civil remedies in affirming a defendant's conviction for battering a police officer who was attempting to make a warrantless, and therefore unlawful, entry to the defendant's home).

[30]  The court ignores Baldauf's mention of Clark's opinion on this matter.

26

for basic fairness – that a police officer should not be able to create the situation that provides probable cause for a person's arrest.

Her argument has some appeal.  In *Sledd v. Lindsay*, 102 F.3d 282, 288 (7th Cir. 1996), the Seventh Circuit held that qualified immunity was not available to police officers who, although armed with a search warrant, failed to give the required "knock and announce" before breaking into a college student's house.  The student, hearing noises and fearing intruders, raced back to his room, recovered a rifle, and then confronted an unidentified man in plain clothes who was pointing a gun at him.  *Id.* at 286.  In the commotion that followed, the unidentified man, who turned out to be one of the officers, shot the student, who was subsequently charged with attempted murder and other crimes.  *Id.*  The trial court ruled that the officers had qualified immunity and dismissed, under Rule 12(b)(6), the student's false arrest, excessive force, and other § 1983 claims.  *Id.* at 284.  The Seventh Circuit reversed, stating that the officers had "impermissibly created the situation in which [the student] felt the need to arm himself and resist people he believed to be intruders."  *Id.* at 288.  As stated later, *Sledd* stands for the proposition that "when an officer creates a dangerous situation by conducting an unreasonable search or seizure, that officer is stripped of qualified immunity against excessive force claims arising from the situation the officer created."  *Leaf v. Shelnutt*, 400 F.3d 1070, 1077 (7th Cir. 2005).

*Sledd*, however, does not resuscitate Baldauf's false arrest claim.  In *Sledd*, the student was protecting his home – an area around which the Supreme Court has drawn a firm, bright line.  *See Kyllo v. United States*, 533 U.S. 27, 40 (2001).  More importantly,

27

the student did not know that the intruders were police until after he was shot.  Davidson and Baldauf, in contrast, were in a public place, and Baldauf initiated the encounter. (Baldauf Dep. 31.)  Baldauf knew immediately that Davidson was an Pittsboro officer. She could not claim, as could the student did in *Sledd*, to ignorance of the actual circumstances.  Rather, she is claiming that Davidson's wrongful conduct made her wrongful response right – and therefore Davidson lacked probable cause to arrest her. As Defendants point out, however, self-defense is an affirmative defense to otherwise culpable conduct.  *See, e.g., Harris v. Cotton*, 365 F.3d 552, 556 (7th Cir. 2004).  An affirmative defense is generally irrelevant as to the existence of probable cause.  *See Humphrey v. Staszak*, 148 F.3d 719, 724 (7th Cir. 1998).

For the foregoing reasons, the court finds that Davidson had probable cause to arrest Baldauf, and therefore so also did his supervisor Marlow, whether as a direct participant, principal, or alleged co-conspirator.  The court therefore will **GRANT** Defendants' summary judgment motions as to all of Baldauf's federal and state claims arising from her allegations that she was falsely arrested or falsely imprisoned.[31]

### B.  Excessive Force Claims Under the Fourth and Fourteenth Amendment

Baldauf claims that Davidson violated her Constitutional rights by using excessive force.  (Compl. ¶ 23.)  Although she spends little time developing this allegation,[32]

---

[31]  Even if the court's conclusion that probable cause existed is inaccurate, an officer reasonably could have believed that there was probable cause.  Consequently, qualified immunity, as discussed *infra*, would shield Davidson from § 1983 liability for the arrest.

[32]  Defendant Davidson asserts that Baldauf did not make a federal claim for the use of
(continued...)

28

Baldauf complains about two uses of force.  She maintains that Davidson shoved her

when he ordered her out of the store the first time.  (*Id.* at ¶ 15.)  She also alleges that,

after she pushed Davidson's finger away, the officer grabbed her hand, twisted it behind

her back, and shoved her against the counter.  (*Id.* at ¶ 18.)  Both of these actions

occurred before she drove to the police station.

The first issue to be addressed is not the degree of force that Davidson used but

whether the officer's actions constituted a seizure.  If so, then his use of force is

analyzed under the Fourth Amendment standard of objective reasonableness.  *See*

*Graham v. Connor*, 490 U.S. 386, 388 (1989); *Acevedo v. Canterbury*, 457 F.3d 721,

724 (2006).  If not, then Davidson's use of force is governed by the Fourteenth

Amendment's substantive due process clause, and a constitutional violation occurs when

---

[32](...continued)
excessive force.  (Davidson Br. 18.)  Although Baldauf did not dispute this assertion in her
briefing, her complaint states, "Each of these acts by Defendants Davidson and Marlow violated
her rights under the Constitution, to due process, to be free from unlawful arrest, and to be free
from any punishment or excessive force."  (Compl. ¶ 23.)

This paragraph is one of 15 under the heading of "Factual Allegations," a section that
also contains Baldauf's allegation that Defendants "caused bail to be set at an excessively high
amount.  In response to Defendants' motion to strike her excessive bail claim, Baldauf
responded that she had not made a claim for relief and that her excessive bail assertion was
only a factual allegation, "as is clear in her Complaint."  (Baldauf Resp. Davidson 28.)

Baldauf's Complaint is not a model of clarity.  However, Federal Rule of Civil Procedure
8(a) only requires a plaintiff to provide "fair notice of what the claim is and the grounds upon
which it rests."  *Walker v. Benjamin*, 293 F.3d 1030, 1039 (7th Cir. 2002).  Baldauf has done as
much.  Although Baldauf does not specifically mention excessive force in her § 1983 claims,
she does assert that "as a result of Defendants' actions the Plaintiff was damaged both
physically and emotionally."  (Compl. ¶ 38.)

Under these facts, and because the Defendants seek dismissal "as to all claims"
(Davidson Mot. Summ. J.; Marlow Mot. Summ. J.), the court will address Baldauf's allegation of
excessive force as a fully made claim.

a police officer's action "shocks the conscience."  *See Chavez v. Martinez,* 538 U.S. 760, 775 (2003)*; County of Sacramento v. Lewis*, 523 U.S. 833, 846-47 (1998).[33]

Under the Supreme Court's definition in *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968), a seizure occurs when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen."  *Id.*  However, in that same case and in later cases, the Court also described this restraint as an infringement on a person's freedom "to walk away."  *Id.* at 16; *Tennessee v. Garner*, 471 U.S. 1, 7 (1986); *see also INS v. Delgado*, 466 U.S. 210, 215 (1984) (declaring that seizures extend to brief detentions short of traditional arrest if "'a reasonable person would have believed that he was not free to leave'") (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

In a general way, the first use of force – Davidson's alleged shove combined with a show of authority – restrained Baldauf's liberty by narrowing her options.  Yet Baldauf remained free to walk way.  Encouraging someone to leave in this fashion may be an abuse of power.  It may also be battery.  Police officers do not have any right "to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."  *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996) (citing *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992)).  However, as the Seventh Circuit has also noted, just because an

---

[33] Substantive due process also protects against the deprivation of fundamental rights and liberty interests that are deeply rooted in the country's history and tradition and implicit in the concept of ordered liberty.  *Washington v. Glucksberg*, 521 U.S. 702, 721-22 (1997).  Included among these protected rights is a person's interest in his bodily integrity.  *Id.* at 720 (citing *Rochin v. California*, 342 U.S. 165 (1952)).  However, the Supreme Court defined that interest as the right to be free from physical contact that "shocks the conscience."  *Rochin*, 342 U.S. at 172.  While pushing and shoving may be tortious, the Court has never found the right to be free from non-injurious force to be a fundamental liberty interest.  *See Chavez*, 538 U.S. at 775 (noting the Court's "reluctance to expand the doctrine of substantive due process").

officer's conduct is unreasonable, unjustified, or even outrageous does not mean that a constitutional right has been infringed.  *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175 (7th Cir. 1995).  "Some such conduct may simply violate state tort law or indeed may be perfectly legal, though unseemly and reprehensible."  *Id.*  Davidson's shove was not a seizure.  Nor does it shock the conscience.  Baldauf does not have a constitutional claim here.[34]

Davidson's second alleged use of force is a different matter.  By grabbing Baldauf's hand, forcing it behind her back and upward, and shoving her against the counter, Davidson restrained Baldauf's freedom to walk away.  Whether such a minor restraint is a seizure, however, depends on the circumstances.

In *McCoy v. Harrison*, 341 F.3d 600, 606 (7th Cir. 2003), the Seventh Circuit held that a state animal welfare investigator did not seize a homeowner when he backhanded her in the face after she slammed shut a kennel gate that he was trying to open.  The blow knocked her to the ground.  *Id.* at 603.  When she looked up, the investigator was standing over her, his hand clenching and digging into her right arm.  *Id.*  He then let go and walked away.  *Id.*

In contrast, in *Acevedo*, 457 F.3d at 725, the Seventh Circuit held that, in an altercation between two police officers at a car pound, a reasonable jury could conclude that one of the officers was seized when he was knocked to the ground by a blow to the

---

[34] Or even if a constitutional claim had been established, an officer could have reasonably believed that conduct of the type committed by Davidson up to this point was lawful. Thus qualified immunity, as discussed infra, would shield Davidson from § 1983 liability regarding the shove.

31

head.  The struck officer had been helping a friend recover a towed car from the auto pound.  *Id.* at 722.  A pound official, alarmed by the officer's behavior, called police, and when the other officer arrived, the two policemen began feuding.  *Id.* at 722-23.  In considering whether the struck officer had been seized, the court noted that the blow caused the officer to lose consciousness temporarily.  *Id.* at 725.

The Seventh Circuit acknowledged the different outcome of these seemingly similar cases.  *Id.*  It distinguished *Acevedo* by noting that in *McCoy*, "the totality of the circumstances showed that the blow did not detain the plaintiff significantly."  *Id.*  While this explanation seems of little help, *McCoy* provides some guidance in determining which case controls here.  In *McCoy*, the decision turned largely on the absence of evidence showing that the investigator "intended to or did acquire physical control over her person."  *McCoy*, 341 F.3d at 606.

In this case, under the facts alleged by Baldauf, Davidson intended to acquire physical control over her.  He grabbed her hand and held it momentarily in a way that suggested he was considering what to do next.  Then, he twisted her hand behind her back and forced her against the counter.  These were the actions of an officer who was exerting control over another person with a manner of deliberation not found even in *Acevedo*.  Under these circumstances, a seizure occurred, and the Fourth Amendment requires that Davidson's use of force be objectively reasonable.[35]

---

[35] Under a qualified immunity analysis, Davidson would still be immune from monetary liability so long as an officer could reasonably believe that the use of force was lawful.  *See Graham*, 490 U.S. at 399 n.12; *McNair v. Coffey*, 279 F.3d 463, 468 (7th Cir. 2002) (finding that an officer was entitled to qualified immunity so long as a reasonable officer in his position
(continued...)

In *Graham*, 490 U.S. at 396, the Supreme Court instructed courts to balance the "nature and quality" of the intrusion on an individual's Fourth Amendment rights against the governmental interests at stake.  Specifically, courts should consider the severity of the crime at issue, any threat posed by the suspect to the safety of the officer or officers, and whether the suspect is resisting or attempting to flee.  *Id.*  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene."  *Id.*

Indiana courts have determined that even slight touches can constitute battery, which the Indiana legislature has elevated to a Class A misdemeanor when committed on a police officer.  Ind. Code § 35-42-2-1(a)(1)(B).  A Class A misdemeanor is a relatively serious crime, carrying a sentence of up to a year in jail and a $5,000 fine.  *Id.* § 35-50-3-2.  Baldauf's touching cannot be dismissed as an innocuous act, given the state's desire to assure the safety of its police officers.

According to Baldauf's testimony, however, she never posed a threat to Davidson. Nor was she attempting to flee or resisting the officer, aside from pushing his finger. Baldauf's testimony suggests that Davidson was not concerned about his safety but outraged that he had been touched.  "[H]e was out of control.  His face was red.  His voice was – he was screaming at me.  And he took my arm and twisted it behind my back. . . .  He was telling me, do you know I can arrest you for assault."  (Baldauf Dep.

---

[35](...continued)
"would not have understood that what he was doing" violated the citizen's Fourth Amendment rights).

57.)  In contrast, Baldauf was compliant when he seized her hand.  (*Id.*)  She did not attempt to flee or resist.  (*Id.*)

As previously mentioned, Baldauf has submitted evidence that she also was yelling.  (Baldauf Resp. Davidson 5; Albright Dep. 93.)  Davidson had asked her to leave.  (Baldauf Dep. 54.)  Baldauf had refused, telling Davidson that she was not finished shopping, and "to get away from me, to shut up and leave me alone."  (*Id.* at 56.)  Regardless of how it began, a very public altercation was brewing.[36]  In this context, Davidson's response to Baldauf's pushing of his finger was effective.  It ended the dispute.  This does not mean, however, that it was reasonable.  Excessive force, as the term itself denotes, usually is effective.

Defendants contend the force was reasonable because officers are taught that "when a subject's action escalates, the officer must respond with an objectively reasonable amount of force until the aggressor's actions are neutralized."  (Guthrie Report 10.)[37]  Davidson's response – pinning Baldauf by locking her arm behind her back – was at the "lowest level" of physical force in a continuum of responses ranging from

---

[36]  Baldauf repeatedly describes Davidson as putting his finger "in" her face – a description that seems both deliberately imprecise and equivocal.  While the court has given her description the favor it must under the summary judgment standard, the court notes that Albright describes the encounter differently.  (*See* Albright Dep. 49-52, 57-60.)  According to Albright, after Davidson asked Baldauf to leave, she "pointed at him," and "he pointed to her stuff on the counter and pointed to the door."  (*Id.* at 57.)  It was at this point that Baldauf "grabbed" Davidson's finger.  (*Id.*)

[37]  The court has ignored Guthrie's opinions insofar as they are based on his review of the record  – a review that was not undertaken in the light most favorable to the non-moving party.  (*See, e.g.*, Guthrie Report 7 (adopting Davidson's account that Baldauf refused to follow his commands to calm down and that she "vigorously grabbed his finger").)  But this opinion and the others cited do not suffer from the same infirmity.

officer presence to deadly force.[38]  (*Id.* at 7, 12.)  "It is better to act forcefully enough at the onset to establish immediate and effective control rather than risk the perils to both the officer and suspect in a prolonged struggle or fight."  (*Id.* at 8.)

As the Supreme Court noted in Graham, "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at 396-97.  But this is not, under Baldauf's facts, the scenario of an officer *confronting* a tense, uncertain, and rapidly evolving situation.  It is an officer *creating* a tense, uncertain, and rapidly evolving situation.  This is not important because it shows malice or fault on Davidson's part.  An officer's intentions are irrelevant to a Fourth Amendment analysis.  *Graham*, 490 U.S. at 397.  It is important because Davidson's own actions were part of the circumstances that he was confronting.

Here, Baldauf never threatened Davidson or anyone else in the store.  Secondly, she did not have any contact with Davidson until he thrust his finger forward.  Thirdly, her alleged response, pushing his finger aside, was not disproportionate.  Finally, she remained calm and compliant when the officer grabbed and then held her hand while deciding what further action to take.  At this point, the officer had control of the smaller,

---

[38]  Guthrie describes Davidson's actions as a "strength technique" at the lowest level of force known as "soft empty hand control."  (Guthrie Report 4.)  Even minor amounts of force can be excessive depending on the circumstances.  *See Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996).

older woman.[39]  No further force was needed, under the facts favorable to Baldauf.  A jury could conclude that twisting Baldauf's arm behind her back and forcing her against the counter was objectively unreasonable.

Davidson is still entitled to qualified immunity if he had a mistaken understanding that his use of force was legal and his mistake as to the law's requirements was reasonable.  *Saucier v. Katz*, 533 U.S. 194, 205 (2001).  Thus, even though his use of force may have been unreasonable, no liability arises unless (1) a clearly analogous case establishes Baldauf's right to be free from the force used against her or (2) his use of force was so plainly excessive that a reasonable police officer would have known that his or her conduct violated the Fourth Amendment.  *See Lanigan v. Village of E. Hazel Crest*, 110 F.3d 467, 476 (1997); *Clash*, 77 F.3d at 1048.

Here qualified immunity becomes a fact-sensitive question.  In the absence of any provocation or need for the use of force, police do not have the right to shove, push, or assault, and this right to be free from gratuitous force has been clearly established in the Seventh Circuit since 1992.  *Clash*, 77 F.3d at 1048.  Under Baldauf's version of events, Baldauf was only responding defensively when she pushed his finger and therefore Davidson's response was a gratuitous use of force in the absence of provocation or an unprivileged use of force.  At this stage such facts remain disputed and each side describes the other as the aggressor.  Qualified immunity is not appropriate.

---

[39]  *See* Albright Dep. 83 (describing Davidson as about six-feet, four-inches tall and Baldauf as about five-feet, five-inches tall).

For the forgoing reasons, the court **DENIES** Defendants' summary judgment motions as to Baldauf's federal claim that Davidson used excessive force during the encounter in the Crystal Flash.

### C. First Amendment Violation

Baldauf alleges in her complaint that Davidson and Marlow violated her First Amendment rights by detaining and arresting her because she was exercising her right to criticize the police department.  (Compl. ¶¶ 33-38.)  It is hard to be more precise because Baldauf has pleaded few details regarding the elements of her claim.  At a minimum, she is claiming that Davidson, with Marlow's agreement and support, arrested her "in retaliation for her lawful exercise of protected speech."  (Baldauf Resp. Davidson 17.)  Her complaint can be read broadly to allege also that Davidson violated her First Amendment rights by trying to silence her at the Crystal Flash, or that Davidson and Marlow arrested her afterward to mute her future credibility about the incident or to prevent her from making a police brutality complaint.  The rules of notice pleading, with limited exceptions such as fraud, do not require specificity.  *Thomson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004).

#### 1. Retaliatory Arrest

To maintain a First Amendment claim under 28 U.S.C. § 1983, a plaintiff must show that (1) his or her conduct was constitutionally protected, and (2) that this conduct was at least a substantial or motivating factor in the defendant's allegedly retaliatory acts.  *Morfin v. City of East Chicago*, 349 F.3d 989, 1005 (7th Cir. 2003).  If the plaintiff

37

can establish these two elements by a preponderance of the evidence, the burden shifts to the defendant to prove, also by a preponderance of evidence, that the same acts would have occurred in the absence of the protected conduct. *Spiegla v. Hull*, 371 F.3d 928, 943 (7th Cir. 2004).

Earlier this year, the Supreme Court stated that in retaliatory firing cases "the causation is understood to be but-for causation, without which the adverse action would not have been taken." *Hartman v. Moore*, — U.S. —, —, 126 S.Ct. 1695, 1703-04 (2006). Since then, the Seventh Circuit has further explained its holding in *Spiegla*, noting that the "substantial or motivating" requirement applies to the plaintiff's affirmative burden of production. *Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006).[40] Once the plaintiff has made this showing of a prima facie case, "the defendants may show that the retaliation was ***not*** the but-for cause" of the adverse action. *Id.* (emphasis in original). If the defendants manage this, by a preponderance of the evidence, then the plaintiff bears the burden of persuasion to show that the defendant's proffered reasons were merely pretext. *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 940 (7th Cir. 2004). Thus, to survive summary judgment, a plaintiff must provide evidence sufficient to allow a rational finder of fact to infer that the defendant's explanations were lies. *Massey*, 457 F.3d at 717.

Baldauf meets the first requirement. Her criticisms regarding the Pittsboro Police Department's conduct concern the sort of issues of public concern that the First

---

[40] *Hartman*, which concerned a retaliatory arrest claim, was decided April 26, 2006; *Massey*, a retaliatory firing case, was decided August 10, 2006.

Amendment protects most strongly.  *See, e.g.*, *Gazarkiewicz*, 359 F.3d at 940-41 (noting

that even in the restricted employment context an employee still retains some rights to

comment on political, social and other community concerns).  The store was open for

public business, and there is no suggestion that Davidson was acting as an agent of the

store in ordering her from its premises.  *See, e.g.*, *Lloyd Corp. v. Tanner*, 407 U.S. 551,

570 (1972) (holding that a private shopping center may restrict the exercise of First

Amendment rights on property that has not been dedicated to public use).  Likewise, her

right to file a complaint with the town is protected under the First Amendment.  *See*

*United Mine Workers of America v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)

(holding that the right to petition for a redress of grievances is "among the most precious

liberties safeguarded by the Bill of Rights").

Baldauf falters on the second requirement, showing that retaliation was a

substantial motivation for the arrest.  Her claim rests on an inference from this sequence

of events:  Baldauf was criticizing the department; Davidson threatened to arrest her; she

told Davidson she was going to see Marlow; Davidson called the chief; Baldauf

complained to Marlow but he refused to take her complaint; Davidson arrested her.

Viewed from this perspective, Baldauf has alleged a prima facie case.  In *Spiegla*, the

Seventh Circuit noted that causation can be established by showing that the adverse

action closely followed the protected activity.  371 F.3d at 944.  The defendants,

however, have cited substantial evidence showing that Baldauf's comments were not the

but-for cause of her arrest.  Rather, Davidson and Marlow, whether personally or

professionally, were affronted by her physical contact with Davidson.

39

Baldauf's own deposition describes an officer struggling to figure out how to respond to her contact with his finger, not her prior statements.  According to her account, Davidson took her hand and held it for a minute before twisting it behind her back and forcing her to the counter.  (Baldauf Dep. 57.)  Telling her that he could have arrested her for assault, he ordered her out of the store.  (*Id.* at 57, 62-63.)  When she threatened to complain to his boss, he boasted that nothing would happen.  (*Id.* at 63, 65.)  He then called Marlow.  (Johns Dep. 48.)

Johns heard Davidson tell his chief that Baldauf had raised her voice and that he had ordered her to leave.  (*Id.* at 50.)  He told Marlow that Baldauf had grabbed his finger and that he had spun her around and told her to leave again.  (*Id.*)  He also told Marlow that Baldauf was going to file a complaint. (*Id.*)  When Davidson got off the telephone, he told Johns that Marlow had instructed him that he should have arrested Baldauf.  (*Id.* at 48-49.)

Later, at the station, Marlow asked Davidson if he was sure he wanted to arrest Baldauf.  (Baldauf Dep. 78.)  Davidson's replied, "Well you told me to do it."  (*Id.* at 79.)  Marlow answered, "[Y]ou wanted me to do it."  (*Id.*)  Taken as a whole, the  conversation suggests that the officers were concerned about which officer should arrest her.[41] Marlow and Davidson subsequently went into a nearby office to discuss her arrest, and Baldauf said she overheard them arguing about whether she should be arrested.  (*Id.* at 80-81.)

---

[41]  One possibility is that Davidson, a junior officer, was initially nervous about arresting a county commissioner, and Marlow had offered to make the arrest.

40

Finally, both Davidson and Marlow testified that Baldauf was arrested on Marlow's orders and belief that she had battered the officer.  (Davidson Dep. 112; Marlow Dep. 168-69.)  Marlow advised Davidson to arrest Baldauf because "[h]e had to step up for fear of her doing that again."  (Davidson Dep. 112.)  All of these facts aim at one conclusion – Baldauf was arrested because of her physical contact with Davidson.

Baldauf has failed to offer any evidence pointing another direction.[42]  Although her testimony indicates that one of the officers had second doubts about whether the arrest should be carried out, she has not provided any evidence of what those doubts were. The mere existence of doubts about the rationale or wisdom of making an arrest neither supports nor negates a retaliatory motive.[43]  The testimony that Davidson and Marlow were offended by her comments is not sufficient to overcome the evidence that her physical contact with Davidson was the cause of her arrest.   As the Supreme Court has noted, "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway."  *Hartman*, 126 S.Ct. at 1704.  Baldauf has not submitted sufficient evidence from which a reasonable jury could find that the

---

[42]  At one point in Marlow's office, Baldauf stood and said she would take her complaint to the county sheriff.  (Baldauf Dep. 73.)  Marlow told her to sit back down.  (*Id.*)  Considered in isolation, Marlow's response might indicate a motive to prevent her from filing a complaint with the county.  However, Baldauf's description of her interview in Marlow's office shows either (1), that the chief and Davidson had already determined to arrest her and Marlow was trying to keep her in his office until Davidson arrived, or (2), that Davidson had decided to arrest Baldauf despite Marlow's subsequent doubts.  (See *id.* at 74, 78-79.)  In either case, Baldauf's comment to Marlow about complaining to the county sheriff would not have been a factor in her arrest.

[43]  Marlow and Davidson had reason to believe that probable cause existed for her arrest.  As the Supreme Court noted this year, probable cause is "highly valuable circumstantial evidence" that the allegedly wrongful conduct "would have occurred even without a retaliatory motive."  *Hartman v. Moore*, — U.S. —, —, 126 S.Ct. 1695, 1704 (2006).

officers arrested her in retaliation for her comments or in an attempt to prevent her from exercising further her First Amendment rights.

### 2.  Suppression of Baldauf's In-Store Speech

Baldauf's First Amendment claim against Davidson, however, does not depend on a retaliatory arrest claim.  She alleges that Davidson ordered her out of the Crystal Flash because he was offended by her comments.  (Compl. ¶¶ 13, 15.)  Although a private store is not a public forum, there is no evidence or suggestion that the owner of the private property had granted Davidson any authority over its premises.  Nor, by Baldauf's account, did Davidson have any legal basis for ordering her to leave.  As discussed earlier, he could not consider her disorderly until he had asked her to be quiet and she had refused, and Baldauf disputes that this occurred.  Nor could he maintain that he was fulfilling his peace-keeping duties if he was the one who was yelling and was upset.  (*See* Buchanan Dep. 13-15.)  Baldauf has submitted sufficient evidence from which a reasonable trier of fact could conclude that Davidson used his authority as a police officer to stifle her comments about the Pittsboro Police Department by ordering her to leave the store.

Nor is Davidson entitled to qualified immunity here.  The law is well-settled that the act of requiring someone to leave a public place can be an infringement on a person's exercise of free speech.  *See Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005).  The court has been unable to find a case holding that the act of requiring someone to leave a public accommodation, such as a store, can also be a First

Amendment infringement when the officer is acting on his own initiative and not that of the store.  However, the mere absence of a precisely analogous case does not establish qualified immunity.  *Alexander v. DeAngelo*, 329 F.3d 912, 919 (7th Cir. 2003) (citing *United States v. Lanier*, 520 U.S. 259, 271 (1997)).  "It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books."  *McDonald by McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992).  In this case, a reasonable officer would know that he has no authority on his own to require a store customer to leave the premises for making comments that the officer found offensive.

For the foregoing reasons, the court will **GRANT** Marlow's summary judgment motion as to Balfdauf's First Amendment claim and **DENIES** Davidson's motion for summary judgment on this issue.

### D.  Conspiracy Claims

Baldauf's conspiracy claims, which appear to be lodged against Marlow and Davidson, are tied to her claims of false arrest and retaliatory arrest under § 1983 in Count IV of her complaint.[44]  (Compl. ¶¶ 33-38.)  As the Seventh Circuit has stated, "the function of conspiracy doctrine is merely to yoke particular individuals to the specific torts charged in the complaint."  *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988)

---

[44]  As discussed, *supra* n.3, Baldauf has dropped her assault and battery claim against Marlow.

(noting also that a § 1983 constitutional tort case is still a tort case).  Inasmuch as the court will dismiss Baldauf's specific tort claims relating to false arrest and retaliatory arrest, her conspiracy claims will be dismissed as well.

Under state law, civil conspiracy is not an independent cause of action.  *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994).  Conspiracy requires concerted action by two or more persons "to accomplish an unlawful purpose or to accomplish some purpose, not itself unlawful, by unlawful means."  *Indianapolis Horse Patrol, Inc. v. Ward*, 217 N.E.2d 626, 628 (Ind. 1966).  Here, the court has determined that Baldauf was lawfully arrested and for a lawful purpose.

The court therefore will **GRANT** the summary judgment motions of Davidson and Marlow on Baldauf's conspiracy claims.

### E.  Municipal Liability Under § 1983

Baldauf seeks to hold Pittsboro liable, for false arrest, excessive force, and retaliation against her exercise of her First Amendment rights, and for a failure to train and supervise Davidson and Marlow.[45]  (Compl. Counts IV-V.)  A municipality, such as Pittsboro, cannot be held liable under § 1983 for the acts solely of its employees or agents.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).

---

[45]  Counts IV (alleging violations of the First, Fourth, and Fourteenth Amendments) and V (alleging a failure to train and supervise) both name Marlow as a defendant in his official capacity.  This, however, is only a peculiarity of pleading.  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

Rather, a plaintiff must show that the municipality itself, through the execution of its policies or customs, caused the constitutional violation. *Id.*

Unconstitutional policies or customs generally take one of several forms. A municipality has an express policy that, when enforced, causes a constitutional deprivation. *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003). Its employees or agents engage in practices that have become so widespread and settled that they constitute the municipality's custom or usage. *Id.* A final policy-maker (a person whose acts can be said to represent official policy) causes the injury. *Monell*, 436 U.S. at 694. Finally, a municipality's failure to train or supervise employees, under circumstances that amount to "deliberate indifference" to the rights of persons, can be described as a municipal policy or custom. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Baldauf specifically asserts a failure to train and supervise. (Compl. Count V.) This is the only basis for municipal liability that she addresses in her brief. (*See* Baldauf Resp. Pittsboro 13-23.) However, inasmuch as Baldauf has asserted Pittsboro's liability more directly for her injuries (see Compl. Count IV), the court will briefly consider other bases for Pittsboro's liability on Baldauf's surviving claims of excessive force and violations of her First Amendment rights.

### 1. Liability for Unconstitutional Policy, Practice, or Act by Policy-maker

While Baldauf has presented substantial testimony, whether admissible or not, of Pittsboro Police misdoings, none involves incidents substantially similar to the events at the Crystal Flash such that Pittsboro Police could be said to have a widespread practice

45

of pushing or shoving citizens, provoking confrontations, or retaliating against persons exercising their First Amendment rights.  Indeed the only suggestions that Baldauf's experience was typical of the way that Pittsboro officers treated civilians are made by Baldauf herself and Buchanan.  (*See, e.g.*, Baldauf Dep. 37; Buchanan Dep. 18.) Neither, however, is asserting the sort of personal knowledge that might substantiate a claim that Davidson was acting that night according to express policies or the accepted practices of Pittsboro police.

Nor will liability lie under a theory that Marlow was a "final policy-maker."  First, it is doubtful that a town marshal could be considered a final policy maker under the powers delegated to him by state law.  *See* Ind. Code § 36-5-7-4 (listing the powers and duties of a town marshal); *McMillian v. Monroe County*, 520 U.S. 781, 786 (1997) (holding that a court must consider how the relevant state law defines an official's functions in determining whether the official is a policy-maker).  Setting that question aside, Baldauf has made no claim that Marlow was involved in Davidson's alleged use of excessive force and the court is dismissing her claims that Marlow himself retaliated against her.  It is well-settled law that a plaintiff cannot bring a § 1983 cause of action against an individual "merely for their supervisory role of others."  *Palmer*, 327 F.3d at 594.  If Marlow does not have any liability in his individual capacity, neither would Pittsboro, even if Marlow was deemed a final policy-maker.

46

2.  *Failure to Train and Failure to Supervise Claims*

Baldauf chiefly argues that Pittsboro's failure to train and supervise its officers led to the violations of her constitutional rights.  (Compl. ¶¶ 39-43.)  In her briefs and submitted evidence, she portrays a small town police department run like a rowdy, outlaw social club.

Among the allegations: Marlow had sex with a high school girl in a town office.[46] (Donald Cook Dep. 40-41.)  At Marlow's urging, Davidson, in uniform and at Town Hall, licked the stomach of a woman with whom Marlow indicated he had just had sex. (Davidson Dep. 60-62.)  Disciplinary action was lax.  A reservist, who admitted stealing about $1,000 from his employer, was allowed to resign but was not charged criminally. (Marlow Dep. 98-100.)  The chief himself failed a breathalyser test after his wife reported that he was driving while intoxicated and the reserve officer found him in his car, parked in front of the police station.  (Richard L. Isaac, Jr. Dep. 87.)  After Baldauf's arrest, Marlow was convicted of receiving stolen property – a laptop computer that the police department had seized and which was found in his possession.  (See *Marlowe v. State*, Mem. Decision No. 32A04-0507-CR-396, 2-3 (Ind. Ct. App. Aug. 3, 2006) (upholding

---

[46]  For reasons that will be evident, the court need not elaborate on the admissibility of each allegation under the Federal Rules of Evidence.  However, at least some of Baldauf's allegations would be admissible if relevant.  For example, former Pittsboro Officer Donald Cook, who succeeded Marlow as marshal, testified that Marlow laughingly described another officer walking into the town manager's office where Marlow and a high school girl were engaged in sexual intercourse.  (Cook Dep. 40-41.)  This testimony might qualify as the admission of a party opponent under Rule 801(d)(2)(a).

Marlow's conviction for receiving stolen property but reversing his conviction for perjury).[47]

Such misdeeds, if true, describe a department running amok, as Baldauf claims. (Baldauf Resp. Pittsboro 15.)  More importantly, Baldauf alleges that Marlow and at least two town council members, Terry Mitchell and former officer Anthony Ardeel, were aware of at least some of these issues, yet failed to take action.  (*Id.* 8-11.)  She also maintains that the town lacked any written regulations governing the use of force, citizen complaints, off-duty arrests, hiring, and other functions and duties of its officers.  (*Id.* 3-4, 15.)  In this way, she alleges, the town condoned this "rampant improper conduct" and, in effect, caused Baldauf's rights to be violated.  (*Id.* 23.)

In *Canton*, the Supreme Court was emphatic that a plaintiff could not establish a municipality's liability merely by showing that the city's training of its police officers was inadequate.  *Canton*, 489 U.S. at 388-390.  Rather, a plaintiff must demonstrate the city's deliberate indifference to the adequacy of its officers' training.  *Id.* at 388.   Generally, a plaintiff does this in one of two ways.  First, a plaintiff can show the municipality failed to train its officers to deal with situations that occur with regularity and present an obvious potential for constitutional violations.  *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003) (citing *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409

---

[47]   The perjury charge stemmed from an accusation that, while being deposed by an attorney representing Baldauf on her criminal charges, Marlow lied about recording Baldauf's conversation with the officers while they were transporting her to the Hendricks County Jail. The Indiana Court of Appeals found that the conviction could not be upheld when the questions and Marlow's responses were ambiguous.  *Marlowe*, Mem. Decision, 4-6.  The stolen property charge was unrelated to the events involving Baldauf.

(1997); *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997)).  Secondly, a plaintiff can establish the municipality's awareness of a pattern of constitutional violations and its subsequent failure to address the problem.  *Id.* (citing *Palmquist v. Selvik*, 111 F.3d 1332, 1346 (7th Cir. 1997)).  Finally, even if the municipality is shown to be deliberately indifferent regarding an aspect of its officers' training, the plaintiff's task is not done.  The plaintiff must also show a causal nexus – a close relationship between the "identified deficiency" and the "ultimate injury."  *Palmquist*, 111 F.3d at 1345 (quoting *Canton*, 489 U.S. at 391).

Baldauf's claim of inadequate training falls short on every requirement.  First, she has not presented any evidence identifying inadequacies or shortcomings in the training of Pittsboro police officers.[48]  Nor has she established the city's deliberate indifference, either by facts showing a recurring situation requiring additional training or by evidence of a pattern of constitutional violations.  To counter Pittsboro's substantial showing regarding the training that Davidson and others received (*see, e.g.*, Defs.' Exs. I, J), Baldauf has submitted testimony regarding wrong-doings by various officers.  Yet, she has not gathered the sort of evidence that might be relevant to a failure to train claim, such as prior instances in which Pittsboro officers bullied or otherwise intimidated people in their ordinary dealings with citizens.

---

[48] This assessment would not be different even if the court had allowed the report of her proposed expert, Roger A. Clark, to be considered in this matter.

49

The force of Baldauf's argument, however, is not concerned with the adequacy of the officers' formal training but with her allegation of a failure to supervise.[49]  Generally, a failure to supervise claim depends on showing a pattern of constitutional violations from which the city's "tacit authorization" can be inferred.  *See Canton*, 489 U.S. at 397-98 (O'Connor, J. concurring and dissenting) (noting with approval a lower court's requirement that a plaintiff bringing a failure to supervise claim must show a history of wide-spread abuse) (citing *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)).  Even if this pattern is shown, however, the plaintiff must establish the causal connection between the failure to supervise and the plaintiff's injury.

A fair summation of Baldauf's argument goes like this.  Although she has not alleged a pattern of excessive force and First Amendment retaliation such as she allegedly experienced, she has shown a lack of rules and a breakdown in discipline that caused officers to believe they were above the law and could act with impunity in their dealings with citizens – and led Davidson to treat her as he did.  This theory of municipal liability resulting from a general failure of supervision and breakdown in discipline is not without support, although not from case law in this circuit.

In *Bordanaro v. McLeod*, 871 F.2d 1151, 1158-1162 (1st Cir. 1989), the First Circuit found that the city's failure to update its regulations, its haphazard disciplinary practices, and general lack of accountability – coupled with the awareness of city officials of these shortcomings  – established the city's deliberate indifference to the

---

[49]  In this regard, Baldauf characterizes Pittsboro's failure to supervise as a separate issue from her failure to train claim.  (Baldauf Resp. Pittsboro 13.)

constitutional rights of its inhabitants.  Moreover, the court held that a jury could conclude that these general deficiencies led to the brutal beatings by police officers over which the § 1983 lawsuit was filed.  *Id.* at 1162.

Baldauf cites other cases to support her failure to supervise claim.  Among them are *Vineyard v. County of Murray*, 990 F.2d 1207 (11th Cir. 1993), and *Cox v. District of Columbia*, 821 F. Supp. 1 (D.D.C. 1993).  In *Vineyard*, 990 F.2d at 1212, the court held that a county's generally inadequate policies and procedures for recording and following up on complaints against officers demonstrated the county's deliberate indifference to the rights of arrestees.  In *Cox*, 821 F. Supp. at 20, the court imposed liability on a city because of the general failure of its citizen complaint board to address widespread complaints of police use of excessive force.  In *Cox*, and implicitly in *Vineyard*, the court found that the inadequate policies and procedures "led serious misconduct to go unchecked," and this was a sufficient causal connection with the plaintiffs' injuries.  *Cox*, 821 F. Supp. at 19; *see also Vineyard*, 990 F.2d at 1213.

To the extent that these courts imposed liability on a municipality based on general failures in policies, procedures, supervision, or discipline, the court does not find these decisions persuasive.  At the root of the Supreme Court's decisions on municipal liability is a concern that local governments not be held responsible for individual misconduct.  *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (requiring that "[w]here "a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the

51

actions of its employees"); *Canton*, 489 U.S. at 391 (noting that "to adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983"); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (holding that proof of a single, unconstitutional violation is not sufficient to impose municipal liability "unless . . . caused by an existing, unconstitutional municipal policy").

To guard against the imposition of *respondeat superior* or vicarious liability in § 1983 cases, the Court has required that the municipality's alleged shortcomings are specifically related to the injury that occurred.  *See Canton*, 489 U.S. at 389 (noting that liability is proper only where a municipality's failure to train its employees "in a relevant respect" evidences deliberate indifference).  It has required a showing that city officials were either aware or should have been aware that such injury was likely – the "deliberate indifference" requirement.  *Id.* at 389 (stating that a city can be held liable only when a failure to train reflects a deliberate or conscious choice).  Absent some showing of a pattern of violations, the Supreme Court has been reluctant to allow a municipality to be held liable for policies and procedures not clearly unconstitutional.  *See Brown*, 520 U.S. at 408-09.  Liability is appropriate only when "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations."  *Id.* at 409.

This is not the situation that Baldauf presents to the court.  Baldauf describes only a failure to supervise in general, not a failure to deal with the type of issues that her

complaint raises.[50]  A police department's or town's failure to sanction police officers properly, or dismiss them, for having sexual dealings with teenagers, driving while intoxicated or under a suspended license, or stealing property is reprehensible. However, its unwillingness to address these problems does not make Davidson's alleged use of excessive force inside the Crystal Flash a highly predictable consequence.  It may reveal a double standard, without making it more likely that Davidson's alleged use of excessive force resulted from the City's policies rather than of any personal shortcomings.  This might be a closer issue if some of the alleged misdoings were closer in character to the conduct that Baldauf claims to have encountered.  However, while some may describe a disturbing disregard for other's rights, they do not constitute the sort of abusive bullying and First Amendment intimidation that are of concern here.

In the absence of evidence showing any failure to train or supervise in a manner relevant to Baldauf's claims, the court will **GRANT** Pittsboro's motion to dismiss Baldauf's § 1983 claims against the town.

### F.  State Assault and Battery Claims

Baldauf's assault and battery claims under state law run parallel to her federal excessive force claims, involving Davidson's conduct in the Crystal Flash up to and including the point where he allegedly shoved her and told her to leave, as well as his

---

[50]  Baldauf argues also that the Pittsboro lacked any policies or procedures.  As Pittsboro points out, Baldauf's evidence establishes that Pittsboro had not written its own policies and procedures but was relying on some rules and regulations used by the sheriff department reserve program in neighboring Marion County, where some of the officers had received their initial training.  (Christi L. Patterson Dep. 23.)

response to Baldauf's contact with his finger.  Here, however, Davidson's actions must

be judged not according to federal due process standards but according to state law

governing the tortious conduct and immunity.

### 1.  Assault and Battery

In Indiana, assault is the commission of "acts intending to cause a harmful or

offensive contact with the person of the other or an imminent apprehension of such

contact." *Cullison v. Medley*, 570 N.E.2d 27, 30 (Ind. 1991).  A jury could find Davidson's

attempts to block Baldauf's way, coupled with his taunting and close presence, to be

assault.  Battery, as a civil tort, is a non-consensual and intentional contact that is

harmful or offensive.  *See Pritchett v. Heil*, 756 N.E.2d 561, 566 (Ind. Ct. App. 2001).  A

jury could find that Davidson battered Baldauf by shoving her.

Likewise, a jury could find that Davidson battered Baldauf by using excessive

force in response to her finger-pushing.  In *Kemezy v. Peters*, 622 N.E.2d 1296, 1297

(Ind. 1993), the Indiana Supreme Court assumed that an officer could commit assault

and battery by using excessive force in the course of a lawful arrest.  At issue was

whether the Indiana Tort Claims Act ("ITCA") immunized such conduct.  *Id.*  Specifically,

the act exempts a government entity or employee from liability for injuries resulting from

the enforcement of laws except in cases of false arrest or false imprisonment.  Ind. Code

§ 34-13-3-3(8) (formerly § 34-4-6.5-3(7)).  The court found that this section did not

provide any immunity for the use of excessive force, however.  *Kemezy*, 622 N.E.2d at

54

1297.  "Under Indiana law, law enforcement officers owe a private duty to refrain from using excessive force in the course of making arrests."  *Id.*

The continued validity of *Kemezy* has been challenged.  In a subsequent case, the Indiana Supreme Court declared that it would no longer distinguish between public duties and private duties in determining a government's immunity under common law. *Benton v. City of Oakland City*, 721 N.E.2d 224, 230 (Ind. 1999).  Since then, governments defending against excessive force claims have sometimes asserted that *Kemezy* is no longer good law given *Benton*'s abandonment of the public-private duty test.  *See, e.g.*, *Rising-Moore v. Wilson*, No. 1:03-cv-1813, 2005 WL 1607187, at *12 (S.D. Ind. July 7, 2005).

The Indiana Supreme Court subsequently clarified that *Benton* did not deal with statutory immunity under the ITCA.  *King v. N.E. Sec., Inc.*, 790 N.E.2d 474, 482 (Ind. 2003).  It acknowledged, however, that *Benton* "implicitly" disavowed the use of a public-private duty analysis in determining if a particular form of conduct was immunized under the ITCA.  *Id.*  The court had used such a test, in a case decided the same day as *Kemezy*, to determine that section 3(8), then 3(7), did not immunize a city or officer from liability arising from an officer's negligent driving.  *Quakenbush v. Lackey*, 622 N.E.2d 1284, 1291 (Ind. 1993).  In neither *Benton* nor *King*, did the court overturn its prior determinations that liability could arise for negligent driving or excessive force.  In *King*, 790 N.E.2d at 482, the court described the public-private duty test as a "tool" for applying section (3)(8) but said courts were "free to interpret the statutory language without referring to the public/private duty analysis when appropriate."  As such, *Benton* does not

55

provide any basis for finding *Kemezy* to be overturned.  As other courts have concluded, until the Indiana Supreme Court rules otherwise, an assault or battery claim may arise from an officer's use of excessive force in the course of his enforcement of the laws. *See, e.g.*, *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866-867 (S.D. Ind. 2006); *Rising-Moore*, 2005 WL 1607187, at *12.

### 2.  Individual Liability

As a general rule, although there are other exceptions, Davidson is liable individually for misconduct only if he was not engaged in policing.  The ITCA shields a government employee from personal liability to this extent.  Ind. Code § 34-3-3-5.  More importantly for Davidson, another section of the act specifically prohibits a plaintiff from suing a government employee personally if the plaintiff's complaint alleges that the employee was acting within the scope of his employment.[51]  *Id.* § 34-13-3-5(b).  In *Bushong v. Williamson*, 790 N.E.2d 467, 471 (Ind. 2003), the Indiana Supreme Court found the statute to be "fairly explicit on this point."  It agreed with the lower court's determination that an employee cannot be held individually liable "if the complaint, on its face, alleges that the employee's acts leading to the claim occurred within the scope of employment."  *Id.*

Here, Baldauf's complaint is equally explicit or more so.  She alleges that Davidson and Marlow "were at all times relevant to this complaint . . . performing their

---

[51]  The relevant section of the statute reads: "A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally."  Ind. Code § 34-13-3-5(b).

official duties as law enforcement officers for the town of Pittsboro." (Compl. ¶ 6.) Such language cannot be read as anything but an allegation that the officers were acting within the scope of their employment. Under the statute and the Indiana Supreme Court's discussion in *Bushong*, the complaint's language is controlling. Baldauf cannot hold Davidson personally liable.

### 3. Governmental Liability

Municipalities in Indiana have been held liable under the doctrine of respondeat superior for torts committed by their employees at least since *Brinkman v. City of Indianapolis*, 231 N.E.2d 169, 173 (Ind. Ct. App. 1967), when Indiana courts began abrogating governmental immunity for cities. The limit of a city's or town's liability for misdeeds of its employees acting within the scope of their employment and authority is now largely defined by the ITCA. *See King*, 790 N.E.2d at 478 (discussing the court's general abolition of governmental immunity in *Campbell v. State*, 284 N.E.2d 733, 736-37 (1972) and the legislature's responding passage of the ITCA).

It is far from clear that Baldauf is seeking to hold Pittsboro liable for Davidson's alleged conduct – or that she will be able to hold Pittsboro liable. To start, Baldauf only named Davidson and Marlow in her state claims of assault and battery. (*See* Compl. ¶¶ 26-27.) Moreover, as mentioned earlier, she specifically states in response to Marlow's motion for summary judgment, that her claim of assault and battery "is brought against Defendant Davidson alone." (Baldauf Resp. Marlow 5 n.2.) However, given that

57

this comment was made in a footnote and could be regarded merely as a limitation of her claim to Davidson's conduct, the court cannot ignore the issue of vicarious liability.

One requirement of the ITCA, as the Indiana Supreme Court recently reminded, is notice. *See Cantrell v. Morris*, 849 N.E.2d 488, 495 (Ind. 2006). A party making a claim against a political subdivision in Indiana, such as a city or town, must file a claim within 180 days of the loss or injury so long as the subdivision is a member of the political subdivision risk management fund. Ind. Code § 34-13-3-8. The Defendants have asserted that Baldauf's state claims "may be barred for failure to comply with the notice requirements." (Defs.' Affirmatives Defenses ¶ 6.) However, they have not submitted any evidence to support this assertion nor made this claim in their motions for summary judgment.

Generally, a city or town may be liable for the acts of its employees except to the extent that a specific exception under the ITCA applies or the employee was acting outside the scope of his or her employment. *Peavler v. Bd. of Comm'rs*, 528 N.E.2d 40, 42 (Ind. 1988); Ind. Code § 34-13-3-5(b) (allowing a plaintiff to sue an employee personally if the governmental entity raises the defense that the employee was acting outside the scope of the employee's employment).

The rules of agency provide guidance on when an employee is acting within the scope of his employment for purposes of the ITCA. *Celebration Fireworks, Inc. v. Smith*, 727 N.E.2d 450, 453 (Ind. 2000). These principles include whether (1) the alleged wrongful conduct is "of the kind" the employee was hired to perform, (2) occurred

58

"substantially within the authorized time and space limits," (3) was intended to serve the purpose of the employer, and (4) was not an intentional use of force "unexpectable by the master."  *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 793 (1998) (quoting Restatement (Second) Agency § 221(1))).  However, as the Indiana Supreme Court held in *Kemezy*, complaints of excessive force and even criminal acts may fall within the scope of an employment if they are closely associated with the employment relationship.  *Kemezy*, 622 N.E.2d at 1298.  The issue is whether the employee's purpose was, "to an appreciable extent," to further his employer's business.  *Id.* (*citing Stropes ex rel. Taylor v. Heritage House Childrens Ctr.*, 547 N.E.2d 244, 247 (Ind. 1989)).

These rules may place Pittsboro in a curious position.  To the extent that Baldauf succeeds in establishing tortious conduct by Davidson, Pittsboro escapes liability only by showing that Davidson was acting outside the scope of his employment, that his acts were "unauthorized."  Here, Davidson contends that he was seeking to restore the peace – a goal clearly within the scope of his employment.  (*See* Davidson Br. 20.)  It is Baldauf's evidence that suggests the opposite, that Davidson was the one who was yelling and breaching the peace – the sort of unauthorized conduct that would not fall within his duties, despite the way she has pleaded in her Complaint.

Where some of the officer's conduct may include authorized and unauthorized conduct, "the question of whether the unauthorized acts were within the scope of employment is one for the jury."  *City of Fort Wayne v. Moore*, 706 N.E.2d 604, 607 (Ind. Ct. App. 1999).  This is the situation here.  Perhaps by the end of the encounter,

59

Davidson was performing a peace-keeping function.  However, the parties clearly dispute this as well as much of what happened before.  Weighing the credibility of the witnesses is a jury's task.

The court therefore will **GRANT** Davidson's summary judgment motion to dismiss Baldauf's state assault and battery claims and **DENIES** Pittsboro's summary judgment motion with regard to these claims.

## V.  CONCLUSION

In accordance with the discussion above, the court will **GRANT** Davidson's motion (Document No. 63) for summary judgment on the false arrest and false imprisonment claims in Counts II and IV and the assault and battery claims in Count I of  the Complaint, and **DENIES** Davidson's motion for summary judgment (Document No. 63) on Baldauf's claims of violations of her constitutional rights, with respect to the use of excessive force and First Amendment retaliation, in Count IV.  The court will **GRANT** Marlow's motion for summary judgment (Document No. 64) with respect to all claims and will **GRANT** Pittsboro's motion for summary judgment (Document No. 65) with respect to all claims except for the assault and battery claims in Count I, to which the court **DENIES** summary judgment.

Left then for trial or for further adjudication are the following issues:

(1) A claim against Davidson pursuant to § 1983 that he violated Baldauf's constitutional right to due process by an excessive use of force in response to her contact with his finger,

60

(2) A claim against Davidson also pursuant to § 1983 that he violated her constitutional right of free speech by ordering her and/or attempting to force her out of the store to punish her for remarks she had made or to silence her from making any further comments, and

(3) A claim against Pittsboro pursuant to state law that Davidson assaulted and battered her, by shoving and threatening her as he ordered her to leave the store the first time, and by using excessive force after she pushed his finger aside.

Entry of judgment will await disposition of the remaining claims, which share a close factual connection to the claims for which summary judgment is appropriate.

ALL OF WHICH IS ENTERED this 18th day of December 2006.

_____

John Daniel Tinder, Judge
United States District Court

Copies to:

Magistrate Judge Tim A. Baker

Michael K. Sutherlin
Michael K. Sutherlin & Associates
msutherlin@michaelsutherlin.com

Kenneth Collier-Magar
Collier-Magar & Roberts P.C.
kenneth@cmrlawfirm.com

Robb Alan Minich
Michael K. Sutherlin & Associates
robbminich@hotmail.com

Liberty L. Roberts
Collier-Magar & Roberts P.C.
liberty@cmrlawfirrm.com